UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VALERIE BUFORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:15-cv-00157-SEB-TAB |
| ) | |
| COMMISSIONER, INDIANA ) | |
| DEPARTMENT OF CORRECTION, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

Valerie Buford's brother, Leon Benson, is currently incarcerated within the Indiana Department of Correction ("DOC") at the Pendleton Correctional Facility ("Pendleton"). DOC prisoners may be allowed access to a service, named J-Pay, which permits various forms of electronic communications to and from approved persons in the outside world. Both Mr. Benson and Ms. Buford were authorized to use J-Pay to communicate with each other and did so regularly. However, when Ms. Buford posted on social media a short video that Mr. Benson had made and sent to her as allowed by the DOC and the J-Pay system, the DOC retaliated by denying her the ability to use J-Pay. Ms. Buford had publicized the video to gain support for her brother's claims of innocence – expression that is clearly protected by the First Amendment. The retaliation against Ms. Buford for exercising her First Amendment rights is unconstitutional. A preliminary injunction is necessary both to restore her ability to electronically communicate with her brother and to remove the chill on her First Amendment rights.

**Facts**

It is believed that the following facts will be presented in support of the preliminary injunction request.[1]

Valerie Buford is an adult resident of Michigan.  (Declaration of Valeria Buford, Exhibit 1 to Plaintiff's Motion for Preliminary Injunction ["Buford"] ¶ 1).  Ms. Buford's brother, Leon Benson, is currently incarcerated at Pendleton, a DOC facility, after being convicted of murder.  (*Id.* ¶ 2; Declaration of Leon Benson, Exhibit 2 to Plaintiff's Motion for Preliminary Injunction ["Benson"] ¶ 3).  Ms. Buford is close to her brother and has communicated with him during the course of his incarceration. (Buford ¶ 5).

Mr. Benson denies that he committed the offense for which he is confined and Ms. Buford believes he is innocent. (Buford ¶¶ 3-4; Benson ¶ 4). Mr. Benson currently has pending a post-conviction relief request in Marion County Superior Court. (Buford. ¶ 16).  Ms. Buford is not alone in her belief that Mr. Benson is innocent and there are numerous internet sites that are, or in the past have been, devoted to efforts to free Mr. Benson from prison because of his innocence including: Valerie Buford, *Preventable Eyewitness Misidentification: "IMPD Must Revamp Outdate Photo lineup Procedures,"* Care2petitions,http://www.thepetitionsite.com/714/048/537/preventable-eyewitness-misidentification/#sign (last visited Feb. 11, 2015); Facebook, *Free Leon Benson*, https://www.facebook.com/pages/Free-LEON-Benson/439577522775962 (last visited Feb. 1, 2015); *Get Free or Die Trying Since 98 Leon Benson*, http://getfreeordietryingsince98leonbenson.blogspot.com/ (last visited Feb 1, 2015); *Free Leon Benson*, http://www.freewebs.com/freeleonbenson/ (last visited Feb. 1, 2015); Change.org, *Petitioning Governor Mike Pence*, https://www.change.org/p/mike-pence-governor-of-indiana-

---

[1] Inasmuch as no discovery has yet been conducted in this case, the plaintiff reserves the right to supplement the following facts as additional information becomes known.

overturn-the-false-conviction-of-leon-benson (last visited Feb. 1, 2015). (Buford ¶ 14). Ms. Buford has been active in attempting to assist her brother in his efforts to be exonerated and has posted matters on the internet in his support. (*Id.* ¶ 16).

The DOC has an arrangement with a private company, called J-Pay, to provide different methods of electronic communications, at a cost, between prisoners and persons outside of prison. (Benson ¶ 9; Buford ¶¶ 6-7). In order to utilize the J-Pay services the prisoner must be approved by the DOC and the person on the outside must be an approved person on the prisoner's visiting list. (Benson ¶ 10; Buford ¶ 10). J-Pay allows communications through e-messages, video visits, and the sending and receipt of recorded video messages known as videograms. (Buford ¶ 8; Benson ¶ 11). The videograms are no longer than 30 seconds. (Benson ¶ 12; Buford ¶ 9). Aside from utilizing the J-Pay system prisoners may also communicate with those outside of prison by letter or through telephone calls, at a significant cost. (Buford ¶ 13). J-Pay can also be used to electronically send money to a prisoner so that it can be put into the prisoner's account that he or she can draw from while in prison. (Buford ¶ 12).

In the past, both Ms. Buford and Mr. Benson were approved by the DOC to utilize J-Pay to communicate with each other. (Buford ¶ 11; Benson ¶ 10). They communicated regularly with each other utilizing the various forms of communication allowed by the J-Pay system. (Buford ¶¶ 11, 36). Ms. Buford also regularly sent her brother money through J-Pay. (*Id.* ¶ 11). This is the only way that she can send Mr. Benson money. (*Id.* ¶ 13).

The use of J-Pay at Pendleton is governed by a facility directive entitled "J-Pay Kiosk Operations" ("Facility Directive"). (Benson ¶ 15, and attachment to Benson). The Facility Directive indicates that all J-Pay communications will be reviewed and monitored by DOC staff. (Facility Directive at page 7 of 7). And, it is Mr. Benson's understanding that once a videogram

is created it is reviewed by DOC employees to make sure it complies with all of the DOC's rules and requirements. (Benson ¶ 17).

On or about August 6, 2014, Mr. Benson composed a videogram to be sent to Ms. Buford. (Benson ¶ 18).  Ms. Buford did not discover the videogram until September 5, 2014, when she logged into J-Pay to send her brother funds.  (Buford ¶ 19).

In the videogram Mr. Benson thanks his supporters and asks for their continued support. (Exhibit 1 to Buford).[2]  Ms. Buford thought that the videogram would be useful to post for Mr. Benson's supporters to view and would be useful in rallying them to come to his future court proceeding. (Buford ¶ 21).  She therefore posted the videogram on her Facebook page under the event page "PACK THE COURT! MAKE IT TREMBLE! Justice for Leon Benson." (*Id.* ¶ 22). She was never informed of any DOC rule against posting videograms on social media. (*Id.*¶ 23).

However, after posting the videogram to her Facebook page Ms. Buford attempted to use her J-Pay account to communicate with Mr. Benson and when she tried to log on she instead received a message that communication with her brother had been blocked. (*Id.* ¶ 24). She first contacted J-Pay customer support and was told that the communications had been blocked by the DOC. (*Id.* ¶ 25). She was given a phone number to call at the Pendleton Correctional Facility. (*Id.* ¶¶ 26-27).  Upon calling that number she spoke to a woman who indicated that Ms. Buford had contacted the Internal Affairs division at Pendleton.  (*Id.* ¶ 27).  The woman transferred her call to a man, who also identified himself as being with Internal Affairs and who informed her that her J-Pay had been blocked because she had posted the videogram. (¶¶ 28-29). He told Ms. Buford that her J-Pay access would be blocked permanently or for a long period of time. (*Id.* ¶ 29).

Ms. Buford has received no other communications explaining why she is no longer

---

[2]   The videogram is being manually filed because it cannot be converted to an electronic format.

allowed to use J-Pay to communicate with her brother. (*Id.* ¶ 25). She does not believe that she did anything wrong as she believes she was just exercising her First Amendment rights. (*Id.* ¶ 31).

The Facility Directive notes that a prisoner violates the rules regulating J-Pay if he or she:

- engages in discussions of trafficking
- makes any sexual gestures
- makes any threats
- is improperly dressed
- engages in any discussions concerning unauthorized financial transactions
- engages in discussions or displays concerning security threat groups (STGs or gangs)
- engages in gambling
- engages in operating a business or any business transactions

(Facility Directive at 2).

The Facility Directive also states that the DOC "Policy 02-01-103, 'Offender Correspondence' must be adhered to along with this policy when accessing the kiosks for emails/video grams." (*Id.*). The DOC policy also provides that "[o]ffenders sending and receiving videograms shall be informed that the videogram's content is subject to the same rules and procedures as outlined in this policy and administrative procedure. Individuals appearing in videograms shall comply with dress and behavior standards as outlined in Policy 02-01-102, "Offender Visitation." (DOC Policy and Administrative Procedures – Manual of Policies and Administrative Procedures, No. 02-101-103, "Offender Correspondence", attached to Benson[3] ["Policy 02-01-103"] at 26-27). The Policy provides that prisoners have the right to receive and

---

[3] The DOC's Policies and Administrative Procedures are also available on the DOC's website at http://www.in.gov/idoc/2830.htm.

send correspondence "except when there is reasonable belief that the limitation is necessary to protect public safety or facility order and security. However, such correspondence shall not be written in code or include symbols which may disrupt the operation of the facility." (*Id.* at 3). All correspondence is subject to monitoring and inspection to insure "that there is nothing in the correspondence that may present a threat to the safety and security of the facility, staff, other offenders or the public." (*Id.* at 10). Correspondence may be interfered with if:

- there are reasonable grounds to believe that it "[p]oses an immediate danger to the safety of an individual or serious threat to the security of the facility or program" or it may pose a threat to national security

- there are reasonable grounds to believe that it is being sent to other prisoners or persons on various forms of supervised release

- it contains contraband or prohibited property

- the prisoner has been convicted of a crime involving the use of correspondence for unlawful purposes or if he has been found guilty in the DOC of using correspondence to commit misconduct

- outside law enforcement agencies have requested monitoring of correspondence because of reasonable grounds that a crime has been committed.

(*Id.* at 10-11).

The DOC's visitation policy, (DOC Policy and Administrative Procedures – Manual of Policies and Administrative Procedures, No. 02-101-102, "Offender Visitation", attached to Benson ["Policy 02-01-102"] at 26-27), provides that those who video visit are subject to the same rules for regular visitation. (*Id.* at 19). An outside person may have visits denied "if it is determined that to allow such visits would threaten the safety and security of the facility." *Id.* at 21. Generally, "[r]estrictions on the visitation privilege shall be made based upon the safety, security, good order, and administrative manageability of the facility and those persons involved." (*Id.* at 1).

Following the posting of the videogram Mr. Benson was disciplined. (Benson ¶ 20). He was not charged with a violation of the Facility Directive or the DOC's polices concerning visitation or correspondence – instead he was charged with, and convicted of, "group demonstration." (*Id.*). As a penalty he lost 90 days of earned good time credit and he was required to spend 90 days in disciplinary segregation. (*Id.* ¶ 21). He also lost his J-Pay privileges for 90 days. (*Id.*).[4]

Although Mr. Benson has had his J-Pay access restored, Ms. Buford remains blocked. (Buford ¶ 33). Because of the J-Pay ban she and her brother have been unable to send or receive from each other: videograms, e-mails, and video calls. (*Id.* ¶ 34). She has also been unable to send her brother any money. (*Id.* ¶ 35). Not being able to communicate with her brother through J-Pay is burdensome for Ms. Buford. (*Id.* ¶ 36). She lives approximately 4 ½ hours away from Pendleton and is not able to visit on a regular basis. (*Id.* ¶ 37). Moreover, she wants the ability to be able to receive videograms and e-mail messages from her brother and post them on social media and distribute them on the internet so that she can assist him in his efforts to have his conviction reversed. (*Id.* ¶ 38). She is still able to communicate with her brother by letter and would like, if warranted, to post portions of his correspondence on social media or the internet if he sends her something that she believes would be helpful to advance his efforts to be exonerated. (*Id.* ¶ 40).

Therefore, even if Ms. Buford's ability to communicate with her brother through J-Pay is restored, she is concerned that she will post something else in the future that will cause the DOC to once again cut her off from her brother. (*Id.* ¶ 39). Thus, she is currently reluctant to post anything on social media concerning her brother because of concern that either she, or her

---

[4]   Mr. Benson is challenging this discipline in a separately filed habeas corpus proceeding. (Benson ¶ 22).

brother, or both of them, will be punished in some way. (*Id.* ¶ 41). However, Mr. Benson wants to continue to communicate with his sister to have her assist him in his efforts to gain his freedom and Ms. Buford wants to continue to express her support and advocate for her brother. (*Id.* 42; Benson ¶ 23).

**Preliminary injunction standard**

In order to obtain a preliminary injunction, the plaintiffs must demonstrate that absent the injunction they will suffer irreparable harm for which there is no adequate remedy at law and that they have "some likelihood of succeeding on the merits." *Girls Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Once this is shown, they must further demonstrate that the balance of harms favors the grant of a preliminary injunction. In assessing this showing, "the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor.'" *Id.* (quoting *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). Finally, the court must consider the public interest. *Id.* A consideration of all these factors demonstrates that a preliminary injunction should be granted here.

**Argument**

I.  **Ms. Buford will prevail on the merits of her claim**

   A.  **It is unconstitutional for the State to retaliate against a person for engaging in activity protected by the First Amendment**

At the outset Ms. Buford concedes that she has no independent constitutional right to communicate with her brother through the J-Pay system. But, of course, that is not the point. As the Supreme Court noted in 1972:

> [f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some

>reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' . . . Such interference with constitutional rights is impermissible.

*Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (internal citation omitted).  Thus, "[r]etaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Maryland, Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry*). To make a prima facie case that a defendant has impermissibly interfered with a plaintiff's First Amendment rights through retaliation the plaintiff must show "that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing, among other cases, *Thayer v. Chiczewski,* 705 F.3d 237, 251 (7th Cir. 2012). Once a prima facie case is made "the burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013).

> **B.      The posting of the videogram is activity that is protected by the First Amendment**

There is no doubt that posting a message on Facebook to supporters of an individual is protected by the First Amendment.  After all, "the First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Smith v. Arkansas State Highway Emp., Local 131*, 441 U.S. 463, 464 (1979).  And, this right extends to communications via computer and social media, as "[t]he Supreme Court has also made clear that First Amendment protections for speech extend

fully to communications made through the medium of the internet." *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010) (citing *Reno v. ACLU,* 521 U.S. 844, 870 (1997)). *See also, e.g., District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("[T]he First Amendment protects modern forms of communication." [citing *Reno*, 521 U.S. at 849]). Therefore, it would seem obvious that, in general, posting a video on the internet is protected by the First Amendment.

This should be the end of the question of whether Ms. Buford was engaging in activity protected by the First Amendment. However, it is anticipated that the DOC will argue that given that the penalty that has been imposed on Ms. Buford is restricted to her ability to communicate with her brother in prison through J-Pay, the standard that should be utilized to determine whether Ms. Buford's actions are protected by the First Amendment is the standard more usually applied to assess the First Amendment rights of prisoners. In *Keeney v. Heath*, 57 F.3d 579 (7th Cir. 1995), in assessing the validity of a prison regulation prohibiting jail employees from becoming "involved socially" with prisoner as applied to an employee, the court stated that "so far as challenges to prison regulations as infringing constitutional rights are concerned, the standard is the same whether the rights of prisoners or nonprisoners are at stake." *Id.* at 581 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 410 n. 9 (1989)).

Given that the only use that Ms. Buford made of the videogram was to post it on an internet site may be constrained in the same way that prisoners' rights are. However, even if they are, it is still clear that her actions are fully protected by the First Amendment.

Admittedly, "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoners. An inmate does not retain rights inconsistent with proper incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Conversely, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with

the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). And, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974).

In *Martinez*, overruled in part by *Thornburgh*, the Supreme Court held that limitations on prisoner personal correspondence were justified only if they "further an important or substantial interest unrelated to the suppression of expression" and officials must show that "a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Id.* at 413. Additionally, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.*

In *Thornburgh*, however, the Court concluded that the holding of *Martinez* had to "be limited to regulations concerning outgoing correspondence" given that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." 490 U.S. at 414. The Court concluded that the regulation of incoming correspondence to prisoners was subject to the standards enunciated in *Turner v. Safley*, 482 U.S. 78 (1987), where the Court both upheld a prohibition on prisoners communicating with each other and also struck down regulations unduly restricting prisoners from marrying. *Thornburgh*, 490 U.S. at 413-14. *See, e.g., Koutnik v. Brown*, 456 F.3d 777, 784 n.4 (7th Cir. 2006) (noting that the standard enunciated in *Martinez* must be used "to evaluate the regulation of prisoners' outgoing mail.")

In *Turner* the Court reiterated the principle that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." 482 U.S. at 84. However,

the Court recognized that "[r]unning a prison is an inordinately difficult undertaking" committed to the legislative and executive branches and that, accordingly, calls for "a policy of judicial restraint." *Id.* at 84-85. Therefore, the Court reconciled the constitutional principles and penological needs by rejecting any heightened scrutiny, instead holding that the ultimate question is "whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." *Id.* at 87.

The Court then enumerated four factors which must be considered in assessing the propriety of a prison regulation:

> (1) Whether the regulation has a valid, rational connection to a legitimate governmental objective. *Id.* at 89.
>
> (2) Whether there are alternative means for the prisoners to exercise the right in question. *Id.* at 90.
>
> (3) The extent of the impact the accommodation of the right in question will have on prison staff, other prisoners, and the allocation of prison resources generally. *Id*.
>
> (4) Whether there are ready alternatives to the regulation. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . By the same token, the existence of obvious, easy alternatives, may be evidence that the regulation is not reasonable, but an 'exaggerated response' to prison concerns." *Id.*

"The four factors are all important, but the first one can act as a threshold factor, regardless of which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). "Therefore, if a regulation is not rationally related to a legitimate and neutral government objective, a court need not reach the remaining three factors." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (internal citation omitted).

In this case Ms. Buford is being punished for the use she made of the videogram that Mr. Benson sent to her. This is, essentially, punishing her for receipt of an electronic

communication, which is analogous to outgoing correspondence. This analogy is confirmed by the DOC's own Offender Correspondence Policy that treats videograms as correspondence. (No. 02-01-103 at 25). Ms. Buford is being punished because she received electronic correspondence that she, in turn, used to advocate what the DOC is now terming a "group demonstration." The question is whether the videogram is protected by the First Amendment.

The government obviously has a substantial penological interest in discouraging group demonstrations within prisons. *See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977) (allowing prison authorities to ban meetings of a prisoner "labor union"). Such group activities "possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." *Id.* at 132. Prisoners have no First Amendment, or other, right to engage in demonstrations.

Of course, the "demonstration" that Ms. Buford promoted on her Facebook page was not a demonstration at all and was not to be located at Pendleton Correctional Facility, or any other prison. It was a request that Mr. Benson's supporters "pack the court" to support her brother. This is hardly an unusual, or improper, request or tactic. *See, e.g., U.S. v. Ali*, 508 F.3d 136, 148 n.16 (3rd Cir. 2007) (noting that the defendant had over 150 supporters in the courtroom at sentencing); *U.S. v. Pon,* No. 3:14-cv-75-J-39PDB, 2014 WL 3340584 at *7 (M.D. Fla. May 29, 2014) ("In addition to the information and arguments presented in the motion to reopen, defense counsel displayed that Pon had strong support (his supporters packed the courtroom."); *U.S. v. Mendoza,* No. 12CR4710 WQH, 2014 WL 310799 at *1 (S.D. Cal. Jan. 38, 2014) ("Defense counsel stated that Defendant has been living in Orange County since 1993, that his wife and four children are United States citizens, and that Defendant had many supporters in the courtroom."). Urging supporters to come to court, whether the urging is by a prisoner or the

prisoner's sister, cannot be objectionable as a trial courtroom is "a public place where the people generally – and representatives of the media – have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980) (plurality opinion). "What transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

*Martinez* establishes that the DOC's punishment of Ms. Buford is constitutionally permissible only if it is justified by the penological interests of "security, order, and rehabilitation" and if it is narrowly tailored to those interests. *Martinez*, 416 U.S. at 413-14. Simply put, the DOC has absolutely no interest in what Ms. Buford and her brother's supporters do at his Court hearing. In discussing the more deferential *Turner* standard the Supreme Court stressed that it is to be applied "*only* to rights that are 'inconsistent with proper incarceration.'" *Johnson v. California*, 543 U.S. 499, 510 (2005) (Court's emphasis) (quoting *Overton*, 539 U.S. at 131). Nothing that Mr. Benson did in sending the videogram or that Ms. Buford did in posting the videogram or in seeking to organize support for her brother was "inconsistent with proper incarceration." Nor can the punishment for the videogram be related in any way to the DOC's interest in "security, order, and rehabilitation." Even under the *Turner* standard the DOC's actions cannot stand as the burdening of Ms. Buford's rights is not "reasonably related to legitimate penological objectives." *Turner,* 482 U.S. at 89. It is not related to any penological objective. Ms. Buford was engaging in constitutionally protected behavior in posting the videogram on her Facebook site.

      C.    **The action taken against Ms. Buford represents retaliation**

Having established that the posting of the videogram was protected by the First Amendment, Ms. Buford must establish that "the government responded with retaliation."

*Eischenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).  The question is did the government respond in a way that was "sufficient to deter an ordinary person from engaging in that First Amendment activity in the future."  *Santana v. Cook County Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012).

Certainly in some cases this is a nuanced analysis, requiring a weighing of what the government did against how a reasonable person would respond. Such subtlety is not necessary here. There is no doubt that the DOC has retaliated against Ms. Buford solely because of the First Amendment activity – the posting of the videogram.  Given that the DOC has banned her from J-Pay, Ms. Buford cannot engage in the First Amendment activity of posting the J-Pay videograms and the ordinary person in Ms. Buford's situation would not just be deterred but would be absolutely precluded from engaging in the activity.

### D. The DOC's retaliation was a direct result of Ms. Buford's expressive activity

The question of whether "the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins*, 756 F.3d at 996, is also easy to answer in this case. This is not a case where there is a question as to whether there were other factors that could justify the DOC's actions.  The only reason that Ms. Buford's J-Pay privileges have been suspended is because she engaged in the protected activity of posting the videogram.

### E. The DOC cannot establish that it would have terminated Ms. Buford's J-Pay access even if she had not engaged in the protected activity

Having established that the DOC retaliated against her for exercising her First Amendment rights the burden shifts to the DOC to show that "the harm . . . would have occurred anyway."  *Green v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).  This inquiry also need not take long in this case.  Given that the sole reason that the DOC terminated Ms. Buford's J-Pay access

was because of the videogram posting, the DOC simply cannot rebut Ms. Buford's prima facie demonstration of retaliation in this case.

## II.     The other requirements for the grant of a preliminary injunction are met here

### A.     Ms. Buford is being caused irreparable harm for which there is no adequate remedy at law

It is well-established that the denial of constitutional rights is irreparable harm in and of itself. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law."). Indeed, in the First Amendment context, the Supreme Court has noted specifically that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Given this, "money damages are therefore inadequate." *Joelner v. Village of Washington Park. Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (citation omitted). Ms. Buford is therefore faced with irreparable harm for which there is no adequate remedy at law.

### B.     The balance of harms favor Ms. Buford

Without an injunction Ms. Buford will be faced with an ongoing violation of the First Amendment. Because she has demonstrated a substantial likelihood of success on the merits of his claim, "no substantial harm to others can be said to inhere in its enjoinment." *See, e.g.*, *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). An injunction will only force the DOC,

on the other hand, to conform its conduct to legal norms and the requirements of constitutional law. A governmental entity cannot claim that requiring it to comply with the First Amendment to the United States Constitution is harmful. *See Christian Legal Soc'y*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The balance of harms therefore favors the issuance of equitable relief.

### C. The public interest favors a preliminary injunction here

The Seventh Circuit has noted that "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. As the Sixth Circuit has similarly held, it is "always in the public interest to prevent violation of a party's constitutional rights." *Déjà vu of Nashville*, 274 F.3d at 400 (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Thus, the public interest is served by the enforcement of the First Amendment to the United States Constitution and by the grant of a preliminary injunction.

### III. The injunction should issue without bond

The issuance of a preliminary injunction will not impose any monetary injuries on the DOC. In the absence of such injuries, no bond should be required. *E.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**Conclusion**

All the requirements for the grant of a preliminary injunction are therefore met in this case. One should enter, without bond, requiring the DOC to immediately restore Ms. Buford's J-Pay access with her brother and preventing the DOC from interfering with her access to her

brother because of any internet postings or other public dissemination of information that she receives from him or because of any other lawful advocacy that she takes on his behalf.[5]

> s/ *Kenneth J. Falk*
> Kenneth J. Falk
> No. 6777-49
>
> s/ *Kelly R. Eskew*
> Kelly R. Eskew
> No. 22953-49
> ACLU of Indiana
> 1031 E. Washington St.
> Indianapolis, IN 46202
> 317/635-4059
> fax: 317/635-4105
> kfalk@aclu-in.org
> keskew@aclu-in.org
>
> Attorneys for Plaintiff

### Certificate of Service

I hereby certify that on this 26th day of February, 2015, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Jefferson S. Garn
Deputy Attorney General
Jefferson.garn@atg.in.gov

> s/ *Kenneth J. Falk*
> Kenneth J. Falk
> Attorney at Law

---

[5] It is important that the injunction prevent such future interferences as the actions that the DOC has taken have caused a chill on Ms. Buford's rights to free expression. (Buford ¶¶ 38-42).