UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VALERIE BUFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00157-SEB-TAB |
| | ) | |
| COMMISSIONER, INDIANA | ) | |
| DEPARTMENT OF CORRECTION, in his | ) | |
| official capacity; JOHN DOE, in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE IN OPPOSITION TO
MOTION FOR A PRELIMINARY INJUNCTION**

**Introduction and factual background**

Valerie Buford, the plaintiff, asks this Court to issue a preliminary

injunction. Through her motion for a preliminary injunction, Ms. Buford confronts

this Court with the question of whether it should compel the Indiana Department of

Correction ("the Department") to allow inmates and recipients of video messages to

violate the terms of service agreement that users agree to before using the email

and video messaging services. This Court should decline to intrude dramatically on

the business of a private corporation and on the operations of a state prison

administration, to which courts have traditionally afforded broad discretion.

Specifically, this case concerns certain video messaging services for inmates

through JPay, a private company with which the Department has a contract to

provide services, including money transfers, video visitations, email, and

videograms. JPay contracts with several correctional agencies, including the Department of Correction, to provide these services. Katz affidavit, p. 1.

Through a video kiosk, inmates may send personal video messages called VideoGrams to individuals who are approved to receive messages by that inmate's correctional facility. *Id.* Individuals who correspond with inmates through JPay's email service and wish to receive VideoGrams from those inmates must agree to certain terms under a user agreement. *Id.* The user agreement in place in August and September 2014 expressly forbid users from reproducing or copying messages. *Id.*

Valerie Buford's brother, Leon Benson, a convicted murderer, is an inmate at Pendleton Correctional Facility. Dkt. 1, p. 4. Ms. Buford violated the user agreement when she posted a VideoGram from her brother on her Facebook page. Dkt. 1, p. 4. As a result, the Department suspended her JPay privileges. Dkt. 1, 4-5. The Department subsequently restored Ms. Buford's JPay privileges. Basinger affidavit, p. 1. But Ms. Buford may not post any videograms on Facebook or any other social media site because terms of service prohibiting reproduction of messages are still in place and the Department may limit use of the messaging service to its intended purposes—*personal* messaging.

Recipients of VideoGrams no longer have the capability of posting VideoGrams to social media websites such as Facebook because the files are no longer stored locally on the device and can only be played through the JPay app. Ex. 1, Katz affidavit, p. 1.

Ms. Buford in her motion for a preliminary injunction asks this Court to order the Department to restore Ms. Buford's JPay access. The Department has restored Ms. Buford's JPay access so that request is moot.

Ms. Buford also asks the Court to prohibit the Department "from interfering with her access to her brother because of any internet postings or other public dissemination of information that she receives from him or because of any other lawful advocacy that she takes on his behalf." Dkt. 9, p. 17-18.  It is not entirely clear what specific relief Ms. Buford seeks through this second, breathtakingly broad request. Taken at face value, such relief is plainly improper because it would block the Department from ensuring that sensitive information is not disseminated to the general public. If Ms. Buford's request is narrowed to mean the Department may not infringe upon Ms. Buford's First Amendment rights, the request is so vague as to be meaningless.

If the request is narrowed a bit more to mean that the Department must allow Ms. Buford to post videograms she receives from Mr. Benson, her request remains improper because of the technological controls now in place, because of the purpose of the videograms themselves as articulated in the user agreement, and because of the valid security concerns the Department has if inmates could use relatives as conduits for posting videos online. Ms. Buford invites this Court to inaugurate an inmate popularity contest to see who could make the biggest online splash, get the most "hits" or "likes," and become the next internet meme. For all these reasons, this Court should decline Ms. Buford's invitation to take a drastic and unprecedented step by granting her preliminary injunction.

**The preliminary injunction standard: a court should issue a preliminary injunction in only the most unusual cases for the most compelling reasons.**

While a court may exercise the "far-reaching power" of a preliminary injunction, such power should never "be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 389 (7th Cir.1984) (internal quotations and citation omitted).

A court should consider several factors when a party moves for a preliminary injunction: whether that party can show a likelihood of success on the merits, whether there is an adequate remedy at law, and whether the movant would suffer irreparable harm if the court does not grant the preliminary injunction. *Reid L. v. Ill. State Bd. of Educ.,* 289 F.3d 1009, 1020–21 (7th Cir.2002). The court then balances that harm with any irreparable harm an injunction would cause an opposing party, adjusting the calculus depending on the party's likelihood of success. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008). A party with little likelihood of success must show more harm than would a party with a strong likelihood of a success. *Id.* This harm must be real and a court may only award relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (*citing Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). Finally, a court should inquire as to whether granting the preliminary injunction would be in the public interest. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1086.

I.   **Ms. Buford cannot meet her burden for the extraordinary relief of a preliminary injunction because she is unlikely to succeed on the merits**

Ms. Buford will not succeed on the merits. In addition to the burden she carries of establishing that she is entitled to a preliminary injunction, she bears an additional "weighty burden" because "courts must grant substantial deference to prison administrators." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)(citing *Overton v. Bazzetta*, 539 U.S. 126, 132; *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007). Courts have generally "adopted a broad hands-off attitude toward problems of prison administration." *Procunier v. Martinez,* 416 U.S. 396, 404 (1974) (overruled in part for not taking enough of a "hands-off attitude"). Indeed, a proper analysis should begin by calibrating "the appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." *Jones v. NC Prisoners' Labor Union*, 433 US 119, 125 (1977).

Here, Ms. Buford goes beyond the more "typical" extraordinary nature of a preliminary injunction request, and asks this Court to take the even more extraordinary and unprecedented step of voiding a private contractor's user agreement and compelling the Department to permit an inmate to use a service, one intended for personal messages to approved persons, to speak through video to whomever he wants. The Court should decline to take such a dramatic step and deny Ms. Buford's request for a preliminary injunction.

**A. Posting a VideoGram is not an activity protected by the First Amendment and limiting use of VideoGrams is not retaliation, but instead the insistence that J-Pay VideoGram recipients use the service in a manner consistent with a VideoGram's purpose.**

Generally speaking, a government may not retaliate against someone for speaking out. *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012). A plaintiff makes out a prima facie case for a retaliation claim if she shows that she engaged in an activity protected by the First Amendment, she suffered a deprivation likely to deter future First Amendment activity, and the First Amendment activity was at least a motivating factor in the government official's decision. *Id.*

In an attempt to make out a retaliation claim at this early stage, Ms. Buford builds her request for a preliminary injunction, indeed, her entire case, on unsupported and unexamined assumptions about what the Department did and why. Ms. Buford's act of posting a VideoGram online is not protected by the First Amendment because the Department did not impose a restriction on Ms. Buford's speech activity, but merely gave her access to services for a certain purpose, then suspended her use of that service after she abused it. Accordingly, the Department did not retaliate against Ms. Buford for exercising her First Amendment rights.

**1. Posting a VideoGram is not an activity protected by the First Amendment.**

Ms. Buford first tries to frame her argument as to why posting a VideoGram is protected activity by means of a simple syllogism: the First Amendment guarantees that people may post stuff on the internet; Ms. Buford posted her brother's VideoGram; therefore, posting a VideoGram is protected by the First

Amendment. Dkt. 9, p. 9-10. But context matters, especially here. And in this context, the First Amendment does not protect Ms. Buford.

The Department permits certain approved persons to use certain services. In doing so, the Department expects those approved persons to use those services in a manner consistent with the service's purpose. Doing so is not *restricting* use, but rather recognizing the limitations inherent in the service itself. After Ms. Buford abused the service, the Department temporarily denied her use of the JPay service. The Department has subsequently reinstated her privileges. Insisting that she use the service, particularly the JPay VideoGram service, in a way that comports with the service's purpose is not an imposition upon her First Amendment rights.

Indeed, in this context, the Department is not imposing restrictions at all. Ms. Buford implicitly acknowledges as much in the second sentence of her memorandum in support of her preliminary injunction. There, Ms. Buford correctly states that "prisoners may be allowed access to a service, named JPay, which permits various forms of electronic communications *to and from approved persons* in the outside world." Dkt. 9, p. 1 (emphasis added). There is nothing in the JPay videogram service itself to suggest that anyone intended the videos to be rebroadcast, posted, or sent to anyone other than an approved person. It is a personal messaging service, not a broadcasting service. Ms. Buford acknowledges this in her memorandum in support of her motion, but also acknowledged it when she agreed to JPay's user agreement and consequently agreed not to reproduce the videogram anywhere.

The Department did not impose any restrictions on the videogram service, but the limitations on the service are inherent in the service itself. By analogy, if a parent were to let a teenager borrow the family car, a parent could restrict use by insisting the teenager only drive to and from the movie theater. On the other hand, a parent's admonition to follow the speed limit and drive carefully is a limitation inherent in using the car, not a "restriction" imposed by the parents limiting the teenager's freedom. Likewise, the Department, through J-Pay, has provided inmates, family members, and others a benefit. The Department *has* imposed restrictions, not challenged here, such as prohibitions against dressing improperly, discussing trafficking, or operating a business. Dkt. 9, p. 5. But prohibiting reposting is not one of the restrictions because it is not a restriction at all. Instead, the VideoGram product has limitations built into the product itself, namely, and most pertinent here, it is a personal messaging service and any use beyond that is misuse. Further, a VideoGram's purpose lacks any ambiguity now that a recipient may only view the videogram in a specific app which blocks that user from posting the video on a social media site.

Ms. Buford does not have a right to use any videogram for any purpose she wants; "the First Amendment does not guarantee a speaker the most effective means of communication of [her] message." *Galena v. Leone*, 638 F.3d 186, 204 (3d Cir. 2011) (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). In *Eichenlaub v. Township of Indiana*, a case cited by Ms. Buford for the proposition that she must establish that the Department retaliated against her (Dkt. 9, p. 14-15), the court held that the chairman of a public meeting was

justified in ejecting the plaintiff from a public meeting after the plaintiff attempted to hijack the meeting for his own purposes. 385 F.3d 274, 281 (3rd Cir. 2004). The chairman was justified because a government may limit speech at its facilities and events for certain purposes. *Id*. Similar to a meddler at a meeting who tries to take over the meeting for her own purposes, Ms. Buford misused the videogram service for an unintended and improper purpose, ignoring the purpose and limitations of the service. Such limitations are reasonable, sensible, and inherent to the VideoGram service itself.

> ### 2.   The Department did no retaliate against Ms. Buford, who continues to exercise freely her First Amendment rights.

Likewise, the Department did not retaliate against Ms. Buford for exercising her First Amendment rights. The factual momentum in this case runs toward the conclusion that Ms. Buford has and continues to exercise her First Amendment rights for Mr. Benson's benefit without interference by the Department. The Department suspended her JPay privileges because she abused the service, not because she advocated for her brother's freedom. The Department merely insists that inmates and other users of a JPay service use it in a manner consistent with its purpose.

Ms. Buford concedes that she and her brother were approved to communicate with each other using JPay services and that she "formerly communicated regularly with [her] brother." Dkt. 8-1, ¶¶11, 36. Further, Ms. Buford has long and zealously offered public support for the "Free Leon Benson Cause." If not actually authoring the online sites, she at least plays an active role in posting material, exhorting

supporters, or soliciting funds. Dkt. 8-1, ¶ 14. One quickly discovers by reviewing the various "Leon Benson" websites that Ms. Buford has authored or been active on various sites for years: http://www.thepetitionsite.com/714/048/537/preventable-eyewitness-misidentification/#sign since January 2014; https://www.facebook.com/pages/Free-LEON-Benson/439577522775962 since January 2013; http://getfreeordietryingsince98leonbenson.blogspot.com/[1] since March 2013; https://www.change.org/p/mike-pence-governor-of-indiana-overturn-the-false-conviction-of-leon-benson authored two years ago. Thus, Ms. Buford has advocated for her brother's freedom for years without any interference from the Department. Only after Ms. Buford abused the JPay VideoGram service did the Department temporarily suspend her JPay privileges. Moreover, despite Ms. Buford's professed concern about posting anything online for fear of retaliation, she has continued to post online, at least since February 22, 2015. https://www.facebook.com/pages/Free-LEON-Benson/439577522775962 (posting a link to a gofundme.com site to raise money for Mr. Benson).

The Department "restricted" Ms. Buford's use of J-Pay's videogram service only to the extent it insisted that Ms. Buford use it in a manner consistent with the service's purpose. And by insisting on use consistent with the service's user agreement, the Department did not retaliate against Ms. Buford for any speech that

---

[1] While JPay VideoGram limitations are applied irrespective of content, the content of the various websites may raise concerns. For example, when one thinks about someone trying to "get free or die trying," the mental imagine is not someone expiring peacefully in old age. The Department would reasonably be concerned about a relative posting a VideoGram from an inmate exhorting supporters to attend a hearing on a website with a dichotomized worldview of freedom after conviction or death.

would be protected by the First Amendment. Thus, Ms. Buford's request for a preliminary injunction should be denied.

**B. Even if Ms. Buford's posting of the VideoGram is protected by the First Amendment, such limitations are justified by JPay's user agreement and under *Turner's* deferential standard.**

Even if the Department restricted Ms. Buford's use of the VideoGrams Mr. Benson sent her, such a restriction is justified for at least two reasons. First, from the perspective of JPay, the direct service provider, the Court should reject Ms. Buford's demand that this Court compel the Department to permit her to post VideoGrams online because that would violate JPay Inc.'s intellectual property rights and void a user agreement that Ms. Buford has not challenged. Second, from the perspective of the Department, the Court should reject Ms. Buford's demand because the Department's actions comply with the deferential standard set forth by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).

**1. JPay's Terms of Service prohibit Ms. Buford from posting VideoGrams online.**

Those wishing to correspond with inmates through JPay's email system and receive VideoGrams from those inmates must agree to certain terms under a user agreement. Under the agreement now in place (substantially the same as the user agreement in place in September 2014), JPay reserves the rights of JPay and "the client" (the Department) to "enforce this Terms of Service" and "protect the rights, property or safety of JPay and its Clients." Ex. 1, Katz affidavit, attachment 2. Further, users agree that they "will not copy, reproduce, alter, modify, or create derivative works from the Service," and that "JPay owns all of the content,

including any text, data, information, images, or other material, that you transmit through the Service." *Id.* In addition, "JPay may at any time and for any reason, without prior notice, terminate this Service, terminate this Terms of Service, or terminate your account." *Id.* Finally, any dispute over the service must be resolved by and through arbitration administered by the American Arbitration Association. *Id.* Ms. Buford does not mention the Terms of Service that she necessarily agreed to when she signed up to correspond with her brother by email and receive VideoGrams. Courts have upheld such terms of service even when applied against minors who may not have affirmatively agreed to the terms of service, unlike Ms. Buford, an adult who affirmatively agreed to the terms of service. *See, e.g., E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 901 (S.D. Ill. 2012). Thus, Ms. Buford had no right to post a VideoGram from Mr. Benson and or to violate the terms of service in the future.

### 2. The Department is justified in limiting use of VideoGrams under the deferential *Turner* standard.

If Ms. Buford did engage in activity protected by the First Amendment (despite the VideoGram's purpose and despite the Terms of Service), any limitation should be analyzed by a standard that would be applied to prisoner's speech. After all, the VideoGram is Mr. Benson's exhortation to his supporters.

The theme of Supreme Court decisions related to prisoners' First Amendment rights has been the Court's effort to discern the proper level of deference to prison officials. *Thornburgh v. Abbott*, 490 U.S. 401, 408-410 (1989). Courts have understood *Procunier v. Martinez*, the Supreme Court's first significant decision

about prisoners' First Amendment rights, as requiring a kind of "strict 'least restrictive alternative,' without sufficient sensitivity to the need for discretion in meeting legitimate prison needs." *Id.* at 410. Subsequently, courts have generally settled on the more deferential standard enunciated in *Turner v. Safley*, where the Court set forth four factors a court should consider when analyzing a particular prison regulation. Specifically, a court should look to:

(1)  whether there is a rational relationship between the regulation and the legitimate government interest advanced;

(2)  whether the inmates have alternative means of exercising the restricted right;

(3)  whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison resources; and

(4)  whether the contested regulation is an 'exaggerated response' to prison concerns and if there is a 'ready alternative' that would accommodate inmates' rights.

*Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)(citing *Turner,* 482 U.S. at 89-90).

As a preliminary matter, Ms. Buford appears to argue at times in her supporting memorandum that, if the Court uses a standard associated with a prisoner's First Amendment rights, the Court should apply the less deferential standard the Supreme Court articulated in *Procunier v. Martinez*, 416 U.S. 396 (1974). Ms. Buford is wrong. *Koutnik v. Brown* suggests that the more deferential standard of *Turner* is limited to regulations concerning *incoming* correspondence, and that *Martinez* would apply to a prisoner's *outgoing* correspondence. 456 F.3d 777, 784 n. 4 (7th Cir. 2006). But *Martinez* itself expressly held that its standard *does not* apply to mass mailings, where "[d]ifferent considerations may come into

play," and the Court specified that "we intimate no views as to [the] proper resolution" of cases concerning mass mailings. 416 U.S. at 408 n. 11. Mr. Benson's VideoGram to his supporters was, in effect, a "mass mailing," so *Martinez*'s standards are inapplicable.

Under a *Turner* (or any) analysis, the Department is justified in limiting VideoGram use to personal messaging. Further, Ms. Buford bears the burden of disproving the validity of the prison limitation. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

VideoGram limitations and the Department's interests are rationally related. Prison officials have a strong interest in maintaining security and order in prisons, and encouraging rehabilitation, and the "Herculean obstacles to effective discharge of these duties are too apparent to warrant explication." *Martinez*, 416 U.S. at 404. James Basinger, the Department's Deputy Commissioner, lists in the attached affidavit, several non-exhaustive reasons why the Department cannot allow recipients of JPay VideoGrams to post those messages online.

First, allowing VideoGram recipients to act as a conduit for an inmate's online messaging would only exacerbate an already tense prison environment by inaugurating an inmate-popularity contest to see which inmate could make the biggest online splash and have the most followers. Exhibit 2, Basinger affidavit. Courts have found these concerns compelling in similar contexts, where, for example, "prearranged press interviews with individually designated inmates" were "often concentrated on a relatively small number of inmates who, as a result, become virtual public figures within the prison society and gain a disproportionate

degree of notoriety and influence among their fellow inmates." *Saxbe v. Washington Post Co.*, 417 U.S. 843, 848-49 (1974) (internal punctuation omitted). Consequently, "those inmates who are conspicuously publicized because of their repeated contacts with the press tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison." *Id.* Further, there is the risk that inmates may use the press to disparage others or their beliefs, or the organizations to which they belong, further increasing tensions. *Hammer v. Ashcroft*, 570 F.3d 798, 801 (7th Cir. 2009). In sum, prison officials are justifiably concerned about "swelled heads." *Id.* If prison officials were justifiably concerned about media notoriety in the mid-1970s, their concerns are only amplified in our world of Facebook and YouTube.

But the Department's concerns do not stop at arrogant inmates with thousands of followers. Mr. Basinger lists additional concerns. For example, other prisoners' privacy rights may be infringed if their images were reproduced online without their permission. Ex. 2. Their images may be captured inadvertently because the video kiosks, where the VideoGrams are recorded, are open booths where, in some facilities, inmates may pass by in the background. Relatedly, the general public would get an unrestricted view of the interior of the prison facility. Ex. 2. Also, prisoners could find a way to make virtual contact with people with whom the prisoner is barred from contacting. Ex. 2.

The Department justifiably and rationally limits use of VideoGrams because it has a strong interest in maintaining order at its facilities. It should be emphasized, however, the reason why the Department allows Videograms in the

first place: to support another strong institutional interest, rehabilitation of prisoners. The Departments wants prisoners to maintain contact with family members if appropriate. Ex. 2. Compelling the Department to permit rebroadcasting of VideoGrams does not further the goals of rehabilitation.

The Court does not need to run through the additional *Turner* factors because there is no evidence that the Department's limitation on the VideoGram service is irrational. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009). But the other factors support upholding the VideoGram limitations.

The second factor, whether inmates have alternative means of exercising First Amendment rights, also supports the Department. Both Mr. Benson and Ms. Buford have enthusiastically exercised their First Amendment rights for years. As discussed above, Ms. Buford has been posting information from and about her brother for years, and continues to do so. The Department is not infringing on her right to argue that Mr. Benson was wrongfully convicted of murder; however, a VideoGram personalized message from Mr. Benson to the masses, in violation of the purpose of the service, is not the proper medium.

The third factor, analyzing the impact on prison staff and others, supports the Department. Prison staff would be unduly burdened if this Court were to compel JPay and the Department to permit reposting of VideoGrams. A prison staff person's duty to screen prisoner communication is hard enough when limited to ascertaining whether a prisoner is sending coded messages to a recipient or violating other Department regulations about personal communication. But trying to foresee the consequences and meaning of a certain message truly intended for

either the general public, an unknown group, or an unknown and unapproved

person would be impossible. Consequently, this factor also weighs in favor of the

Department because of the impact it would have on prison staff.

Fourth and finally, the Department's limitation on VideoGram use is not an

"exaggerated response" because there is no "ready alternative" that would allow Ms.

Buford an unfettered right to post whatever she gets from Mr. Benson online.

VideoGram messages are a great way to allow someone like Ms. Buford, who lives

in Michigan, to communicate with Mr. Benson, who is incarcerated at Pendleton.

Dkt. 9, p. 2. That does not mean she can ignore the service's purposes or the terms

of service she agreed to follow.

The limitations on JPay VideoGram messages are rationally related to the

Department's security concerns. Accordingly, Ms. Buford is unlikely to succeed on

the merits because the Department is not violating her First Amendment rights.

The Court should deny her request for a preliminary injunction.

## II.   Ms. Buford would not suffer irreparable harm because she is now able to use J-Pay in a manner consistent with its purpose, and she asks for monetary damages, an adequate remedy at law.

Ms. Buford tries to show irreparable harm by merely reciting a doctrine that

a violation of a constitutional right sufficiently establishes irreparable harm. Dkt. 9,

p. 16. But such an assertion is "overbroad in that it must be tempered by the

general rule that monetary injunction is not a sufficient basis for injunctive relief."

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162-63

(C.D. Ill. 1997)(*citing Back v Carter,* 933 F.Supp. 738, 754 (N.D. Ind. 1996). Ms.

Buford seeks monetary damages, thus acknowledging that her "injury" is, in some

way, quantifiable and that there is an adequate remedy at law. Dkt. 1, p. 7. But Ms.
Buford is not being harmed at all. Again, Ms. Buford continues to post information
online to support her brother, and the Department restored her JPay privileges.
While she may not reproduce VideoGram messages she receives from her brother,
the Terms of Services makes the limitation unremarkable because Ms. Buford does
not and should not challenge the validity of the limitations imposed by the Terms of
Service. Thus, because she is not suffering any harm at all, much less irreparable
harm, her request for a preliminary injunction should be denied.

## III.    The balance of harms favors the Department because of the security risks associated with permitting unlimited use of messages from inmates.

A Court should only grant a preliminary injunction if, on balance, a plaintiff
shows she would suffer greater irreparable harm than a defendant if a preliminary
injunction were granted. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1086. As
discussed in the previous section, Ms. Buford is not now suffering any harm at all.
On the other hand, if the Court were to compel the Department to permit Ms.
Buford unlimited use of VideoGrams, the Department *would* suffer irreparable
harm. As Mr. Basinger attests, the Department has grave, legitimate concerns
about an inmate using VideoGrams for online communication. Ex. 2. Other
prisoners would undoubtedly hear about Mr. Benson's new capability, and other
prisoners would clamor to establish an online presence. This would start prison
internet popularity contests, contests that are bad enough in high school, but
categorically dangerous in a prison environment. The Court should deny Ms.
Buford's request.

**IV.   The public interest favors denying Ms. Buford's request for a preliminary injunction because JPay, the company, should be able to limit the use of its product.**

Finally, the Court should deny Ms. Buford's request for a preliminary injunction because the public interest favors limiting VideoGram use. When evaluating the "public interest," a court may appropriately consider the ramification of granting or denying the preliminary injunction on nonparties to the litigation. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1100. JPay Inc. is not a party to this litigation. If this Court were to grant Ms. Buford's request for a preliminary injunction, JPay's intellectual property rights could be violated without consequences. The Court would be voiding a nonparty's Terms of Service without permitting that nonparty an opportunity to voice support for those terms. That reason alone tips the public interest in favor of denying Ms. Buford's request.

But the Court should also consider the interest of other nonparties— prisoners other than Mr. Benson. VideoGrams and video visitation services are good things. They allow prisoners to stay in touch with those not incarcerated, maintaining bonds essential to preventing recidivism. If this Court grants a preliminary injunction, prison administrators and legislators in other jurisdictions will surely take notice and will not want to provide these services if it may be used by prisoners to raise their virtual voices directly on the internet. A preliminary injunction could only curtail these services. The Court should take into account the public interest and deny Ms. Buford's request.

**Conclusion**

Ms. Buford will not succeed on the merits. The Department did not retaliate against her, but only insisted that users abide by the terms of services to which they have agreed. Ms. Buford has full JPay privileges, but this does not means she can abuse those privileges. This Court should reject Ms. Buford's request to compel the Department to permit her abuse of the JPay services by denying her motion for a preliminary injunction.

Respectfully submitted,

GREGORY F. ZOELLER
Indiana Attorney General
Attorney No. 1958-98

Date:  March 24, 2015          By:  s/ Jefferson S. Garn
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49

OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Telephone:  (317) 232-6292
Fax:  (317) 232-7979
Email:  jefferson.garn@atg.in.gov

## CERTIFICATE OF SERVICE

I certify that on March 24, 2015, a copy of this *Response in Opposition to Motion for a Preliminary Injunction* was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Kelly R. Eskew
ACLU OF INDIANA
keskew@aclu-in.org

*s/ Jefferson S. Garn*
Jefferson S. Garn
Deputy Attorney General
*Counsel on behalf of Defendants*

OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Telephone:  (317) 232-6292
Fax:  (317) 232-7979
Email:  jefferson.garn@atg.in.gov