UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VALERIE BUFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:15-cv-00157-SEB-TAB |
| | ) |
| COMMISSIONER, INDIANA DEPARTMENT OF CORRECTION, *et al.*, | ) ) ) |
| | ) |
| Defendants. | ) |

**Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

At the time that Valerie Buford filed her preliminary injunction motion and supporting material on February 26, 2015 (Dkt. 8, 9), her ability to communicate with her brother through the J-Pay system had been terminated by the Indiana Department of Correction because she had published a videogram that her brother had sent her. The defendants ("DOC") do not deny that the placement of the videogram on a Facebook site that Ms. Buford maintains to assist her brother's claims of innocence is the reason that they terminated her J-Pay account. However, the DOC argues that it acted because Ms. Buford had violated the usage agreement that she entered into with J-Pay. The DOC further notes that the ability to republish videograms is no longer allowed by the J-Pay system and that it was justified in punishing Ms. Buford because of unique concerns that posting videos taken in the prison environment may cause. And, the DOC argues that a preliminary injunction is unnecessary as Ms. Buford's J-Pay privileges have been restored.

Although Ms. Buford's J-Pay privileges have been restored, a preliminary injunction is still necessary and justified. At this point, in the context of the preliminary injunction request,

there is no need to respond to the DOC's arguments seeking to justify Ms. Buford's punishment for posting the videogram, inasmuch as such future postings are no longer technologically possible.  However, the DOC's argument means that Ms. Buford continues to face loss of her ability to communicate with her brother through J-Pay if she so much as posts an internet message from him. Such retaliatory action clearly violates the First Amendment.  Ms. Buford's First Amendment rights are chilled and a preliminary injunction must issue.

**Additional facts**

The DOC raises a number of additional facts in its preliminary injunction response.  First, the DOC notes that currently a recipient of a videogram from a prisoner no longer has the ability to post the videogram to a social media site. (Dkt. 15-1 at 1 ¶ 5). Second, the DOC states that users of J-Pay, including Ms. Buford, are governed by a use agreement that notifies them, in pertinent part, that:

> **5.   INTELLECTUAL PROPERTY RIGHTS.** You acknowledge that JPay owns all right, title and interest in and to the Service, including without limitation all intellectual property rights (the "JPay Rights"), and such JPay rights are protected by U.S. and international intellectual property laws. Accordingly, you agree that you will not copy, reproduce, alter, modify, or create derivative works from the Service. The JPay Rights include rights to (i) the Service developed and provided by JPay; and (ii) all software associated with the Service.
>
> You also acknowledge that JPay owns all of the content, including any text, data, information, images, or other material, that you transmit through the Service.

(Dkt. 15-1 at 4 ¶¶ 3, 5, at 7 ¶ 5).

The DOC argues that Ms. Buford's retransmission of the videogram violated J-Pay's intellectual property rights.  Ms. Buford was not aware of any terms of use governing J-Pay's intellectual property rights and has no recollection of reviewing the documents produced by the DOC. (Supplemental Declaration of Valerie Buford ["Buford-Supp."] ¶¶ 2-3 [attached to this memorandum as Exhibit 1]). However, it was not J-Pay that terminated Ms. Buford's J-Pay

privileges – it was the DOC. (Dkt. 8-1 ¶ 26). Indeed, upon learning for the first time of the "intellectual property rights" of the use agreement, Ms. Buford contacted J-Pay and was informed that it was J-Pay's position that once the videogram was received she could do anything she wanted with it, including posting it to social media. (Buford-Supp. ¶ 4).

**Argument**

I. **Ms. Buford will prevail on the merits of her argument that the DOC's restriction of her ability to utilize the J-Pay system in retaliation for broadcasting messages from her brother is unconstitutional**

   A. **The fact that videograms can no longer be placed on social media does not moot Ms. Buford's request for a preliminary injunction**

In arguing that Ms. Buford will not be able to prevail on the merits of her claim the DOC makes a number of claims. Despite noting that J-Pay policy has changed so that videograms may no longer be posted to social media sites it argues that: 1) posting a videogram is not protected by the First Amendment; 2) J-Pay's terms of service prohibited Ms. Buford from posting the videogram; and 3) the DOC was justified under the First Amendment in limiting the use of videograms. However, given that J-Pay has changed the service so that videograms can no longer be posted on social media, the first and third arguments noted above are irrelevant to Ms. Buford's preliminary injunction request and will not be responded to at this juncture.[1]

This change in policy, however, does not alter Ms. Buford's need for a preliminary injunction. Ms. Buford has indicated that she wants, among other things, "to be able to continue to receive . . . email messages from my brother that I post to social media and distribute on the internet so that I can assist him in his efforts to have his conviction reversed." (Dkt 8-1 ¶ 38). These email messages are received through J-Pay. (*Id.* ¶¶ 7, 11, 34, 36). Ms. Buford therefore properly notes that "even if my ability to communicate with my brother through J-Pay is restored

---

[1] These arguments are, of course, relevant in responding to Ms. Buford's claim for damages. However, the damages issue is not yet before the Court.

to me, I am concerned that I will post something in the future that will cause the Department of Correction to once again cut off my access to my brother and his access to me." (*Id.* ¶ 39).

This concern is certainly justified as the DOC is relying on paragraph 5 of the J-Pay use agreement that applies equally to emails sent through J-Pay as well as videograms. Therefore, if, as she wishes to, Ms. Buford takes an e-mail message from her brother and places it on social media she will again be subject to revocation of her J-Pay account by the DOC because she has, in the DOC's estimation, copied, reproduced, altered, modified, or created a derivative work from the J-Pay service to the same extent that the DOC contended she did with the videogram.

> **B.** **The DOC cannot rely upon the use agreement allegedly entered into between Ms. Buford and J-Pay as grounds to terminate or suspend her service**

American copyright law "contemplates that most copyrights will not be registered. [Instead] . . . copyright is created every time people set pen to paper, or fingers to keyboard, and affix their thoughts in a tangible medium." *In re World Auxiliary Power Co.*, 303 F.3d 1120, 1131 (9th Cir. 2002) (footnote omitted).[2] The DOC does not develop the argument, but it apparently believes that Ms. Buford's posting of the videogram made by her brother infringed some sort of copyright created and asserted by J-Pay through paragraph 5 of the use agreement. And, presumably, the DOC will make the same argument when Ms. Buford, in the future, posts e-mail messages from her brother that she initially received through J-Pay. There are a number of problems with this argument.

First, it is uncontested that the decision to terminate Ms. Buford's J-Pay service, now restored, was not the decision of J-Pay. It was solely the DOC's determination. Paragraph 5 of the use agreement reserves no rights to the DOC. This is in contrast to paragraph 4 of the agreement that gives both J-Pay and the DOC ("the Client") "the right to access, read, preserve,

---

[2] However, if a copyright-holder wishes to sue for infringement on the copyright, it must be formally registered. 17 U.S.C. § 411(a).

and disclose any information as it reasonably believes is necessary." Paragraph 5 reserves intellectual property rights to J-Pay only. The DOC does not cite any authority, or make any argument, as to why, even if Ms. Buford violated Paragraph 5, it has the authority to punish her. The DOC simply does not have the right to enforce Paragraph 5.[3]

Second, it is not clear at all that Ms. Buford engaged in any activity covered by the use agreement. It is unclear whether the terms "copy, reproduce, alter, modify, or create derivative works" refer to the J-Pay software or hardware, as opposed to the messages transmitted by the service. Certainly, it does not appear that J-Pay has any concern with Ms. Buford's use. (Buford Supp. ¶ 4). However, there is no need to interpret the agreement because, even if those terms contemplate the messages themselves, Ms. Buford's use of the videogram and future anticipated use of the texts of e-mails does not violate the agreement. Her use of the J-Pay generated material to assist in her brother's on-going criminal case is permissible "fair use" under 17 U.S.C. § 107, thus not violating any intellectual property rights reserved by J-Pay.

> This statute provides that:
>
> the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

---

[3] And, given that J-Pay did not act here to terminate or suspend Ms. Buford's usage, the portion of the use agreement concerning binding arbitration (Dkt. 15-1 at 5 ¶ 11 and at 7 ¶ 11) does not apply here.

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

In assessing fair use, the most important factor is the generally the fourth – market effect. *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014), *cert. denied*, 2015 WL 171468 (March 23, 2015). Ms. Buford's use of the J-Pay-generated material has not, and will not, reduce the commercial demand for the original materials. *Id.* at 759. And, of course, Ms. Buford is not using the materials for any commercial purpose but is using them for an issue of public concern, where the scope of the fair use doctrine is wide. *National Rifle Assn. of America v. Handgun Control Federation of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) ("The document was used primarily in exercising HCF's First Amendment speech rights to comment on public issues and to petition the government regarding legislation. The scope of the fair use doctrine is wider when the use relates to issues of public concern."); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526, 1536 (C.D. Cal. 1985), *aff'd*, 796 F.2d 1148 (9th Cir. 1986). ("[W]hen an act of copying occurs in the course of a political, social or moral debate, the public interest in free expression is one factor favoring a finding of fair use."). The nature of the copyrighted work, assuming it is copyrighted, is just the actual information sent through the J-Pay system. The fact that a work is purely informational, as opposed to creative, weighs in favor of a finding of fair use. *Id.* And, although Ms. Buford wants the ability to use the entire "work," *i.e.*, the entire message transmitted through J-Pay, this does not prevent fair use from being found where use of the entire work is necessary. *See, e.g., Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006).

Therefore, even if the DOC could attempt to enforce Paragraph 5 of the use agreement against Ms. Buford, her use of the J-Pay material was permissible.

### C. Punishing Ms. Buford for publishing material sent to her by her brother through J-Pay violates the First Amendment

The DOC argues that videogram posted by Ms. Buford was not protected by the First Amendment solely because its use on Ms. Buford's Facebook account violated the J-Pay use agreement. The DOC's logic covers Ms. Buford's desired use of her brother's J-Pay-generated e-mails on social media. The DOC's sole contention is that the J-Pay services are not intended for rebroadcast and therefore such rebroadcast is not protected by the First Amendment. But, as noted above, Ms. Buford's reposting of her brother's messages in an effort to prove his innocence is not prohibited by the use agreement. Given that the First Amendment protects electronic communications, *Reno v. ACLU*, 521 U.S. 844, 870 (1997), any future postings that Ms. Buford makes represent an activity that is recognized by the First Amendment.

The DOC contends that even if the posting of the videogram was protected to some degree by the First Amendment, it was justified in punishing Ms. Buford because of security considerations created by the unique nature of videograms. Ms. Buford disagrees with this. However, as noted above, given that the J-Pay system has been reconfigured so that Ms. Buford may no longer share videograms on social media, the DOC's arguments are misplaced at this juncture. For purposes of the request for a preliminary injunction, the sole question, given the DOC's insistence that even the reposting of J-Pay internet messages is prohibited, is whether barring this action is justified under the appropriate First Amendment standard. It is not.

The DOC appears to argue that inasmuch as it allows prisoners and members of the outside world to communicate with each other by regular mail or telephone that it is of no consequence that communication through J-Pay is denied. The fact that there may be

communication alternatives is irrelevant as "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want and how to say it." *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 790-91 (1988).[4]

Although the DOC agrees that the standard to assess restrictions on out-going correspondence is set out in *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401 (1989), it argues that this standard does not apply to mass mailings and that the videogram sent by Mr. Benson to Ms. Buford was essentially a mass mailing. (Dkt. 15 at 13-14). The DOC does not explain how a prisoner's message sent to an outsider – clearly not a mass mailing – becomes one that the prison has the right to be concerned about based on the use made of it by the outsider. In any event, as noted in Ms. Buford's preliminary injunction memorandum, the DOC's assertion of the right to punish Ms. Buford in the future for placing her brother's email messages on social media does not withstand even the more deferential scrutiny provided by *Turner v. Safley*, 482 U.S. 78 (1987).

The first *Turner* factor asks whether the DOC's regulation of Ms. Buford's future J-Pay use has a valid, rational connection to a legitimate governmental objective. *Id.* at 89. Again, although the DOC spends all its efforts demonstrating why the videogram prohibition is, in its opinion, penologically necessary, the question at this point – now that videogram sharing is no

---

[4] The DOC cites to the principle, noted in cases exploring whether a restriction on First Amendment activities fall within the category of "reasonable time, place and manner" restrictions, that the government must allow only ample alternative means of communication that do not necessarily have to be the speaker's "first or best choice." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000). However, the DOC has not contended that the ban imposed on Ms. Buford is a reasonable time, place and manner restriction. Given that the DOC asserts a right to punish Ms. Buford for posting a message from her brother received by e-mail while apparently agreeing that she could post the exact same message received from her brother by mail, the DOC could certainly not demonstrate that the prohibition is "narrowly tailored to serve the government's legitimate, content-neutral interests," one of the three required prongs in reasonable, time, place and manner analysis. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Inasmuch as the DOC does not argue that its punishment, and threatened future punishment, of Ms. Buford represents a reasonable time, place, and manner restriction on her speech, its citations to "reasonable time, place, and manner" cases are not relevant.

longer possible – is whether a ban on Ms. Buford's usage of J-Pay e-messages she receives from her brother is warranted by any valid penological interest. If Mr. Benson pens a poem about his life as an innocent incarcerated man and sends it to his sister by regular mail she may, consistent with the DOC's argument, post it on social media. However, also consistent with the DOC's argument, she may not make any similar use of it if the poem is delivered to her by e-mail. It is impossible to discern any legitimate governmental objective for this and the rationales advanced by the DOC to justify a ban on social media use of prison videograms simply do not apply. This irrationality is dispositive under *Turner* because "if a regulation is not rationally related to a legitimate and neutral government objective, a court need not reach the remaining three [*Turner*] factors." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005).

Moreover, it is simply extraordinary for the DOC to argue that Ms. Buford's use of material on social media, outside of the prison, can somehow justify punishment of a free person. After all, "[t]he right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.'" *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 273 (1964)).

The DOC's position that it may again punish Ms. Buford in the future if she places e-mail messages from her brother on the internet is inconsistent with the First Amendment. She will prevail on the merits of her First Amendment claim.

II.   **The other requirements for the grant of a preliminary injunction are met here**

    A.   **Without a preliminary injunction Ms. Buford will suffer irreparable harm for which there is no adequate remedy at law**

The DOC argues that even assuming Ms. Buford's First Amendment rights have been, and are being, impinged upon she is not entitled to a preliminary injunction as she is asking for

damages in this case. Of course, she is asking for damages for the past harm to her First Amendment rights. She needs a preliminary injunction to prevent continuing First Amendment violations. "The loss or impingement of freedoms protected by the First Amendment 'unquestionably constitutes irreparable injury,' . . . and such an injury cannot be remedied by the receipt of damages." *Wheaton College v. Burwell*, No. 1:13-cv-08910, 2014 WL 2826336, *8 (N.D. Ill. June 23, 2014) (quoting *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) [quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)]). This is not a situation where, to cite the case relied upon by the DOC, "the only remedy would be monetary in nature." *Hamlyn v. Rock Island County Metropolitan Mass Transit Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997). As recognized in *Hamlyn*, "those cases which have held that a constitutional wrong constitutes an irreparable injury involve some continuing or future injury which cannot be compensated by monetary damages alone. Examples include a First Amendment claim that one's speech is presently being chilled." *Id.* Ms. Buford's speech is currently being chilled and will continue to be without a preliminary injunction. She is suffering irreparable harm for which there is no adequate remedy at law.

      **B.**      **The balance of harms favor Ms. Buford**

The DOC argues that the balance of harms favor it because of the risks that stem from the "unlimited use of VideoGrams." (Dkt. 15 at 18). However, the risk of posting e-mails, when the posting of messages received by traditional mail is allowed, cannot even be hypothesized. Requiring the DOC to comply with the First Amendment cannot be deemed to harm the DOC. *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (If the government is likely violating the plaintiff's First Amendment rights then the government's "claimed harm is no harm at all.").

### C. The public interest favors the grant of a preliminary injunction

The DOC argues that the public interest would be favored by denying Ms. Buford the ability to post videograms to social media. This is both incorrect and, given the change in the J-Pay program, irrelevant. The public has no interest in denying to Ms. Buford the ability to post messages from her incarcerated brother, whether those messages come from J-Pay or via traditional mail. "[T]he public interest always is served when constitutional rights, especially those involving free speech, are vindicated." *Rubenstein v. Florida Bar*, No. 14-CIV-20786, 2014 WL 6979574, *18     (S.D. Flo. Dec. 9, 2014).

**Conclusion**

In note 1 to its memorandum (Dkt. 15 at 10 n.1), the DOC discusses the fact that it may "reasonably be concerned" if a relative posts on social media an exhortatory message from an imprisoned relative. It does not develop this argument. But certainly Ms. Buford's ability to communicate with her brother through J-Pay remains at risk as she wants to continue to post such messages, although they will now be delivered through e-mail. A preliminary injunction should be granted here preventing the DOC from punishing or otherwise interfering with Ms. Buford solely because she publicly posts messages received from her brother through J-Pay, now restricted to e-mail messages, in her efforts to advocate for him.[5]

*s/ Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49

*s/ Kelly R. Eskew*
Kelly R. Eskew
No. 22953-49

---

[5] The DOC does not dispute Ms. Buford's contention that if a preliminary injunction is granted here it should be granted without bond.

ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
keskew@aclu-in.org

Attorneys for Plaintiff

## Certificate of Service

I hereby certify that on this 17th day of April, 2015, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Jefferson S. Garn
Deputy Attorney General
Jefferson.garn@atg.in.gov

*s/ Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law